IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

◆◆

JESSE HAMMONS,

*Plaintiff-Appellant,*

—v.—

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION; UMSJ HEALTH SYSTEM, LLC; UNIVERSITY OF MARYLAND ST. JOSEPH MEDICAL CENTER, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

## BRIEF FOR PLAINTIFF-APPELLANT

JOSHUA A. BLOCK
LESLIE COOPER
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 17th Floor
New York, New York 10004
(212) 549-2500

DANIEL MACH
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005
(202) 393-4930

ARON FISCHER
ANDREW D. COHEN
JOSHUA M. GOLDMAN
SEAN M. LAU
PATTERSON BELKNAP WEBB
   & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

LOUIS EBERT
ROSENBERG, MARTIN
   & GREENBERG, LLP
25 South Charles Street
Baltimore, Maryland, 21201
(410) 727-6600

*Attorneys for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1394    Caption: Hammons v. University of Maryland Medical System Corp., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Jesse Hammons
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s Aron Fischer

Date: 4.26.23

Counsel for: Appellant

Print to PDF for Filing       Reset Form

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION .................................................................1

ISSUE PRESENTED FOR REVIEW ...........................................................1

STATEMENT OF THE CASE.......................................................................1

BACKGROUND ............................................................................................5

    A.    The State of Maryland Creates UMMS by Statute. ..............................5

    B.    UMMS Purchases St. Joseph and Agrees to Operate the Hospital as a Catholic Institution.................................................................8

    C.    St. Joseph Refuses to Provide Gender Affirming Care. ........................9

    D.    St. Joseph Cancels Mr. Hammons's Surgery......................................10

    E.    Procedural History..............................................................................12

SUMMARY OF ARGUMENT....................................................................15

STANDARD OF REVIEW .........................................................................19

ARGUMENT ...............................................................................................19

I.     UNDER *LEBRON*, UMMS IS A STATE GOVERNMENTAL ENTITY THAT LACKS SOVEREIGN IMMUNITY.................................19

    A.    Under *Lebron*, UMMS is Bound by the First Amendment Despite its Statutory Disavowal of Governmental Status. ...............................20

    B.    Under *Lebron*, UMMS Lacks Sovereign Immunity Because of its Statutory Disavowal of Governmental Status. ....................................21

    C.    Instead of Analyzing Whether UMMS Was Invested with Sovereign Immunity, the District Court Erroneously Analyzed Whether Sovereign Immunity Was "Waived."....................................24

II.    UMMS IS NOT AN "ARM OF THE STATE" WITH SOVEREIGN IMMUNITY UNDER *RAM DITTA*...............................................................26

    A.    The First *Ram Ditta* Factor Weighs Against Sovereign Immunity Because the State Treasury Will Not Pay Any Judgment Against Defendants.........................................................................................29

    B.    The Second *Ram Ditta* Factor Weighs Against Sovereign Immunity Because UMMS Has Operational Autonomy from the State. ............31

1.   UMMS is financially independent. ...........................................32

2.   The State cannot veto UMMS's actions, and UMMS can enter into contracts, buy and sell assets, and sue and be sued. ...........................................................................33

3.   The Attorney General of Maryland does not represent UMMS. ...................................................................37

4.   The government's appointment powers are not accompanied by other mechanisms of control. ...............................................37

C.   The Third *Ram Ditta* Factor Is Neutral Because UMMS Is Required to Serve Both Local and Statewide Concerns. ....................40

D.   The Fourth *Ram Ditta* Factor Weighs Against Sovereign Immunity Because Maryland Recognizes UMMS as a State Instrumentality For Some Purposes, But Not As an Alter Ego. ...................................41

CONCLUSION ......................................................................................45

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Auer v. Robbins*,
519 U.S. 452 (1997) .................................................................38

*Bank of U.S. v. Planters' Bank of Ga.*,
22 U.S. 904 (1824) ...................................................16, 22, 23

*Bennett v. Harford Cnty.*,
301 A.3d 117 (Md. 2023) .......................................................43

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ...........................................................21

*Burrus v. State Lottery Comm'n of Ind.*,
546 F.3d 417 (7th Cir. 2008) .................................................32

*Cash v. Granville Cty. Bd. of Educ.*,
242 F.3d 219 (4th Cir. 2001) ...........................................35, 37

*Christy v. Pa. Turnpike Comm'n*,
54 F.3d 1140 (3d Cir. 1995) ..................................................25

*Durning v. Citibank, N.A.*,
950 F.2d 1419 (9th Cir. 1991) ...............................................32

*Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean
Cardiovascular Ctr. Corp.*,
322 F.3d 56 (1st Cir. 2003) ...........................................*passim*

*Grajales v. P.R. Ports Auth.*,
831 F.3d 11 (1st Cir. 2016) ..............................................28, 42

*Harter v. Vernon*,
101 F.3d 334 (4th Cir. 1996) .................................................41

*Hennessey v. Univ. of Kan. Hosp. Auth.*,
53 F.4th 516 (10th Cir. 2022) ........................................*passim*

*Hess v. Port Auth. Trans-Hudson Corp.*,
    513 U.S. 30 (1994) ........................................................................................30

*Hutto v. S.C. Ret. Sys.*,
    773 F.3d 536 (4th Cir. 2014) ...............................................19, 25, 27

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ...........................................................10

*Kohn v. State Bar of Cal.*,
    87 F.4th 1021 (9th Cir. 2023) ....................................................24, 25

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995).................................................................*passim*

*Maliandi v. Montclair State Univ.*,
    845 F.3d 77 (3d Cir. 2016) ................................................................39

*Mancuso v. N.Y. State Thruway Auth.*,
    86 F.3d 289 (2d Cir. 1996) ...............................................................25

*Md. Stadium Auth. v. Ellerbe Becket Inc.*,
    407 F.3d 255 (4th Cir. 2005) .....................................................36, 37

*Md. Shall Issue, Inc. v. Hogan*,
    963 F.3d 356 (4th Cir. 2020) ............................................................19

*Miller v. Ill. Cent. R.R. Co.*,
    474 F.3d 951 (7th Cir. 2007) ............................................................22

*Napata v. Univ. of Md. Med. Sys.*,
    12 A.3d 144 (Md. 2011) ............................................................42, 44

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    804 F.3d 646 (4th Cir. 2015) .....................................................*passim*

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    745 F.3d 131 (4th Cir. 2014) .........................................31, 32, 38, 41

*Pele v. Pa. Higher Educ. Assistance Agency*,
    628 F. App'x 870 (4th Cir. 2015) ....................................................19

*Ram Ditta v. Md. Nat'l Cap. Park & Planning Comm'n*,
    822 F.2d 456 (4th Cir. 1987) ................................................................*passim*

*Regents of the Univ. of Cal. v. Doe*,
    519 U.S. 425 (1997)....................................................................................28

*Ristow v. S.C. Ports Auth.*,
    58 F.3d 1051 (4th Cir. 1995) ....................................................................29

*Singleton v. Md. Tech. & Dev. Corp.*,
    103 F.4th 1042 (4th Cir. 2024) ..................................................29, 30, 32, 37

*Takle v. Univ. of Wis. Hosp. & Clinics Auth.*,
    402 F.3d 768 (7th Cir. 2005) ....................................................................*passim*

*United States v. Fla. Birth-Related Neurological Injury Compensation Ass'n*,
    No. 20-13448, 2022 WL 1180142 (11th Cir. Apr. 21, 2022).....................33, 39

*Wash. Suburban Sanitary Comm'n v. Phillips*,
    994 A.2d 411 (Md. 2010) ...........................................................................43

*White Coat Waste Project v. Greater Richmond Transit Co.*,
    35 F.4th 179 (4th Cir. 2022) ......................................................................*passim*

*In re Wood*,
    993 F.3d 245 (4th Cir. 2021) ......................................................................42

**Statutes**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1294 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1343 ...............................................................................................1

42 U.S.C. § 1983 ...........................................................................................1, 45

42 U.S.C. § 18116 .....................................................................................1, 3, 12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Md. Pub. Info. Act, Md. Code Ann. Gen. Prov. §§ 4-101–4-601
   (2009) ...................................................................................18, 42, 43, 44

Md. Code Ann., Corps. & Ass'ns § 2-103 ..............................................33

Md. Code Ann., Educ. §§ 13-301-13-313 ..................................... *passim*

## Other Authorities

Fed. R. Civ. P. 12(b)(6) ..........................................................................19

U.S. Const. amend. I .......................................................................*passim*

U.S. Const. amend. XI .....................................................23, 29, 32, 35

U.S. Const. amend. XIV .........................................................1, 12, 45

# STATEMENT OF JURISDICTION

This action arises under the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and 42 U.S.C. § 18116. JA036-041. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. JA021.

On March 13, 2023, the district court entered final judgment disposing of all claims, JA1071-1072, which incorporated the court's previous order dismissing Mr. Hammons's constitutional claims on July 28, 2021, JA092, and its order denying a motion for reconsideration of that dismissal on October 25, 2021, JA109.

On April 10, 2023, Mr. Hammons filed his notice of appeal from that final judgment. JA1073. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 1294.

# ISSUE PRESENTED FOR REVIEW

Whether the district court erred in holding that Defendants-Appellees University of Maryland Medical System Corporation and its subsidiaries are vested with the State of Maryland's sovereign immunity and are, therefore, immune from Mr. Hammons's constitutional claims for damages.

# STATEMENT OF THE CASE

The government has no business owning a Catholic hospital or discriminating against patients based on religious doctrine. But for over ten years, the University

of Maryland Medical System Corporation ("UMMS") and its wholly owned subsidiaries have operated the University of Maryland St. Joseph Medical Center ("St. Joseph" or the "Hospital") as a Catholic institution, in accordance with the Ethical and Religious Directives for Catholic Health Care Services (or "ERDs") developed by the United States Conference of Catholic Bishops. Pursuant to those directives, the Hospital canceled a scheduled hysterectomy for Plaintiff-Appellant Jesse Hammons, a transgender man, shortly before the surgery had been scheduled to take place. They did so based on the National Catholic Bioethics Center's instruction that "*[g]ender transitioning* of any kind is intrinsically disordered[] because it cannot conform to the true good of the human person, who is a body soul union unalterably created male or female." JA825; JA978.

UMMS belongs to "a special class of corporate entities" that "are part of the government despite their ostensibly private character." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 190 (4th Cir. 2022). In *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), the Supreme Court addressed the legal status of such entities. These nominally private corporations are "part of the government" for purposes of constitutional liability where: "(1) creation of the corporation occurred by 'special law'; (2) creation was 'for the furtherance of governmental objectives'; and (3) [there was] retention by the government of 'permanent authority to appoint a majority of the directors of that corporation.'"

*White Coat Waste Project*, 35 F.4th at 191 (quoting *Lebron*, 513 U.S. at 397, 400).

UMMS easily satisfies *Lebron*'s three-part test. *See* Md. Code Ann., Educ. § 13-303

(creation by special law); *id.* § 13-302 (governmental objectives); *id.* § 13-304(b)

(appointment). But UMMS's organic statute also granted UMMS autonomy over its

operations and finances and declared that the new corporate entity "shall not be a

State agency, political subdivision, public body, public corporation, or municipal

corporation and is not subject to any provisions of law affecting only governmental

or public entities." *Id.* § 13-303(a)(2).

Relying on *Lebron*, Mr. Hammons sued, alleging that UMMS and its wholly

owned subsidiaries are governmental entities, and that by canceling his surgery

based solely on Catholic religious doctrine, they violated Mr. Hammons's rights

under the Establishment Clause, the Equal Protection Clause, and Section 1557 of

the Affordable Care Act. The district court ultimately granted summary judgment in

favor of Mr. Hammons on his Section 1557 claim, but it dismissed his constitutional

claims at the pleading stage. The district court agreed with Mr. Hammons that

UMMS and its subsidiaries are governmental entities bound by the Constitution

under *Lebron*. But the district court nevertheless concluded that Mr. Hammons's

constitutional claims were barred by sovereign immunity.

The district court's decision squarely conflicts with the Supreme Court's

decision in *Lebron*. Under *Lebron*, the fact that Maryland retains the power to

appoint UMMS's board of directors makes it part of the government for purposes of individuals' constitutional rights. But, as *Lebron* itself makes clear, that does not automatically make UMMS an "arm of the state" or "alter ego" vested with Maryland's sovereign immunity. To the contrary, *Lebron* itself held that Amtrak lacks the federal government's sovereign immunity despite being part of the government for purposes of individuals' constitutional rights. *See* 513 U.S. at 392.

Moreover, even if *Lebron* had not already resolved the issue, the district court's sovereign immunity analysis also conflicts with this Court's precedents and precedent from other circuits considering similar state-created corporations. Far from being "synonymous" as the district court wrongly assumed, *Lebron* and this Court's test for determining whether a state-created corporation has sovereign immunity frequently point in opposite directions. For example, although the appointment power is sufficient to establish government control under *Lebron*, courts across the country have consistently held that the appointment power is generally *insufficient* on its own to imbue a state-created corporation with sovereign immunity. *See United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 654, 668-69 (4th Cir. 2015) ("*Oberg III*"); *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 537 (10th Cir. 2022); *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 770-71 (7th Cir. 2005); *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d

56, 71 (1st Cir. 2003). Applying the proper test in this case, it is clear that UMMS is not an "arm of the state," and therefore does not share Maryland's sovereign immunity.

The Court should vacate the district court's dismissal of Mr. Hammons's constitutional claims based on sovereign immunity and remand for further proceedings so that his claims can be considered on the merits.

## BACKGROUND

### A. The State of Maryland Creates UMMS by Statute.

There is a "long history" of "corporations created and participated in by the [government] for the achievement of governmental objectives." *Lebron*, 513 U.S. at 386. Beginning in the 1960s, however, the federal and state governments began sponsoring "new 'private' corporations" that were "said by their charters not to be agencies or instrumentalities of the [g]overnment," but were nonetheless "managed by boards of directors on which [g]overnment appointees had not just a few votes but voting control." *Id.* at 391.

UMMS is one of these "new 'private' corporations." The State of Maryland created UMMS by statute in 1984 to privatize a medical system that had previously been operated by the University of Maryland. *See* Md. Code Ann., Educ. §§ 13-301-13-313. The Maryland General Assembly concluded that it was too expensive and difficult for the University of Maryland to "finance, manage, and carry out the

patient care activities of an academic institution within the existing framework of a State agency." *Id.* § 13-302(5). The General Assembly further concluded that "patient care operations are more efficiently served by contemporary legal, management, and procedural structures utilized by similarly situated, private entities throughout the nation." *Id.*

To accomplish these goals, UMMS's authorizing statute directed the Board of Regents (the University's governing body) and UMMS's Board of Directors to "take all actions necessary" to organize a new corporate entity that "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities." *Id.* § 13-303(a)(2). The statute directed the Board of Regents and certain state agencies and departments to transfer medical system assets, all located in Baltimore, to the new entity (*see id.* §§ 13-301(k), 13-307(a)), and the statute granted UMMS "all powers of a Maryland corporation which are not expressly limited by this subtitle," including the power to "own, lease, manage, and operate the medical system." *Id.* § 13-303(b).[1]

One of the central functions of UMMS's authorizing statute was to insulate the University of Maryland and the State of Maryland from any legal exposure for

---

[1] A narrow exception to UMMS's powers concerns the real property initially transferred to UMMS, which can only be sold or leased with the Board of Regents' approval. *Id.*

costs and liabilities arising out of the medical system. Thus, under the statute, UMMS's obligations "[a]re payable only from assets of the Medical System Corporation" and "[a]re not debts or obligations of the University or the State." Md. Code Ann., Educ. § 13-310. The statute also requires UMMS "to assume responsibility for and [to] defend, indemnify, and hold harmless the University and the State" with respect to: "[a]ll liabilities and duties of the University pursuant to contracts and agreements for commodities, services, and supplies utilized by the medical system;" "[a]ll claims related to the employment relationship after the transfer date between medical system personnel and the University and the State;" and "[a]ll claims for breach of contract resulting from the Medical System Corporation's action or failure to act after the transfer date." *Id.* § 13-308(c). The legislation expressly stated that nothing in the statute "shall be deemed or construed to waive or abrogate in any way the sovereign immunity of *the State* or to deprive *the University* or any officer or employee thereof of sovereign immunity." *Id.* § 13-308(f) (emphases added). The statute did not reference the existence of any such immunity for the new private corporation.

But the State of Maryland continued to retain control over UMMS in one critical respect. The authorizing statute provided the Maryland Governor with the power to appoint all voting members of UMMS's Board of Directors. *Id.* § 13-304(b)(1). The statute also included a few additional restrictions on UMMS related

to its interactions with the University. UMMS and the University must enter into an "annual contract" that "stat[es] the obligations between them for th[e] fiscal year." *Id.* § 13-301(b); *see also id.* § 13-306(a). UMMS must also seek permission to apply for any State grants and must "coordinate with University fund-raising efforts" with respect to grants from the federal government and private entities. *Id.* § 13-303(j).

## B. UMMS Purchases St. Joseph and Agrees to Operate the Hospital as a Catholic Institution.

In 2012, UMMS purchased St. Joseph Medical Center from Catholic Health Initiatives. JA125, JA129, JA530, JA1083-1084. To facilitate the purchase, UMMS created a limited liability company—called "University of Maryland St. Joseph"— as a wholly owned subsidiary of UMMS. JA220, JA975.

When it acquired the Hospital, UMMS promised as a condition of the sale that it would maintain the Hospital's Catholic identity and require St. Joseph to continue to adhere to the ERDs developed by the United States Conference of Catholic Bishops. JA976-977, JA1036-1037. The Asset Purchase Agreement provided that at least one seat on St. Joseph's board would be a representative of the Archdiocese of Baltimore. JA1035. UMMS also agreed to establish formal corporate governance measures to maintain St. Joseph's Catholic identity, including a requirement that St. Joseph's "executive team . . . include a Vice President, Mission Integration, who will have a direct reporting relationship to the [St. Joseph] Board," and who would make regular reports to the board and the Archdiocese on such compliance. JA1036-1037.

In addition, UMMS signed a separate Catholic Identity Agreement with the Archdiocese, in which UMMS agreed, *inter alia*, that St. Joseph would undergo an audit every two years by the National Catholic Bioethics Center to assess its adherence to the ERDs. JA546, JA1047. Pursuant to that agreement, if an audit finds "any areas in which [St. Joseph's] activities are inconsistent with its Catholic identity," the Archbishop must be consulted on a corrective action plan, and a follow up audit must be performed within six months. JA1047.

### C. St. Joseph Refuses to Provide Gender Affirming Care.

Pursuant to instructions from the National Catholic Bioethics Center, St. Joseph prohibits medical personnel from providing any gender affirming treatments for transgender patients. JA582, JA979. In particular, St. Joseph follows and implements a National Catholic Bioethics Center guidance document that states: "*Gender transitioning* of any kind is intrinsically disordered[] because it cannot conform to the true good of the human person, who is a body[-]soul union unalterably created male or female. Gender transitioning should never be performed, encouraged, or positively affirmed as a good in Catholic health care. This includes surgeries, the administration of cross-sex hormones or pubertal blockers, and social or behavioral modifications." JA825 (emphasis in original); JA978.

The National Catholic Bioethics Center also dictates that, should a transgender patient come into a Catholic hospital for "unrelated reasons," such as a car accident, Catholic hospitals must not provide the patient with the hormones they are already taking because doing so "amounts to formal cooperation with gender transitioning and is immoral." JA825. And when the National Catholic Bioethics Center audited St. Joseph, it requested data on every single encounter with a patient for the purpose of treating a gender dysphoria diagnosis. JA847; JA1517.

### D. St. Joseph Cancels Mr. Hammons's Surgery.

Mr. Hammons is a transgender man, meaning that he has a male gender identity but was assigned the sex of "female" at birth. JA034. Mr. Hammons has also been diagnosed with gender dysphoria, which is the "clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Kadel v. Folwell*, 100 F.4th 122, 136 (4th Cir. 2024) (en banc), *petition for cert. filed*, No. 24-90 (U.S. July 30, 2024); *see also* JA468. Under widely accepted standards of care issued by the World Professional Association for Transgender Health, some transgender individuals may require surgery to alleviate their gender dysphoria. JA470-471. In these instances, surgical treatment is medically necessary because the treatments are clinically indicated to treat an underlying medical condition, gender dysphoria. JA470-471. For transgender men, surgical treatment options may include chest reconstruction or

breast removal, genital reconstruction, or removal of internal sex organs, including a hysterectomy.  JA470.

Consistent with these standards of care, Mr. Hammons's physician, Dr. Steven Adashek, recommended a hysterectomy as medically necessary to treat his gender dysphoria.  JA034; JA980; JA1523.  Mr. Hammons therefore scheduled his hysterectomy for January 6, 2020, a date when he could take time off work for his surgery and recovery.  JA460; JA980.  Before the scheduled date, Mr. Hammons worked diligently to prepare himself for the surgery, and underwent multiple health screenings with Dr. Adashek, including pre-operative blood tests and an echocardiogram.  JA980.

In late December 2019, Dr. Cunningham, St. Joseph's Chief Medical Officer, directed Dr. Adashek by telephone not to perform Mr. Hammons's hysterectomy at St. Joseph because it was being done to treat gender dysphoria.  JA228, JA988.  Due to an oversight, Dr. Adashek did not inform Mr. Hammons that the surgery had been canceled until January 5, the night before the surgery had been scheduled to occur.  JA240, JA981.  Dr. Adashek called Mr. Hammons that night and informed him that St. Joseph would not allow the hysterectomy to take place because the purpose was to treat gender dysphoria.  JA981.  When he received the call, Mr. Hammons "felt shocked, angry, afraid, and devastated."  JA050.  Mr. Hammons "felt like [he] was being told that [his] health and well-being were not worthy of being protected, and

[he] felt angry that St. Joseph was using other people's religious beliefs to deny [him] the medical treatment [he] needed."  JA461.

### E. Procedural History.

On July 16, 2020, Mr. Hammons sued UMMS, St. Joseph, and other related subsidiaries (collectively, "Defendants"), advancing three claims and seeking compensatory and nominal damages.  JA036-041.  In Count I, Mr. Hammons claimed that Defendants violated his Establishment Clause rights through the agreement to run St. Joseph as a Catholic hospital, which led to the cancelation of his surgery.  JA036-038.  In Count II, Mr. Hammons claimed that Defendants violated his Equal Protection Clause rights by discriminating against him on the basis of his transgender status, which is unconstitutional sex discrimination.  JA038-040.  In Count III, Mr. Hammons claimed that Defendants violated Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, which prohibits sex discrimination in any federally funded health program.  JA040-041.

On July 28, 2021, the district court dismissed Mr. Hammons's constitutional claims, but permitted his Section 1557 claim to proceed.  JA092.  Defendants primarily argued that they were not state actors required to comply with the United States Constitution.  JA061.  The district court disagreed, holding that, under the Supreme Court's decision in *Lebron*, Defendants were part of the State for purposes of the First and Fourteenth Amendments.  JA069-072.

The district court nonetheless held that Mr. Hammons's constitutional claims were barred by sovereign immunity. JA083. The court stated at the outset that "[i]t may seem strained to rely on *Lebron* to determine whether UMMS is part and parcel of government for purposes of state action, and then deploy a separate test to determine whether UMMS is an arm of the state for purposes of sovereign immunity." JA076. According to the court, "the inquiries are really synonymous and the arm-of-the-state analysis answers both questions." JA076.

After making that initial observation, the district court stated it would nevertheless independently examine whether UMMS qualified for sovereign immunity under the four-factor test this Court set out in *Ram Ditta v. Maryland National Capital Park & Planning Commission*, 822 F.2d 456, 457-68 (4th Cir. 1987). But the district court's examination of the *Ram Ditta* factors continued to be guided by its faulty assumption that the *Lebron* and *Ram Ditta* inquiries "are really synonymous." JA076. Even though the State treasury would not be responsible— either legally or practically—for any judgment awarded against UMMS, the district court concluded that UMMS was sufficiently controlled by Maryland to render it an arm of the state. JA077-080. According to the court, "had Plaintiff contended that UMMS is sufficiently autonomous from the State to" defeat a finding that it is an "arm of the state" for purposes of sovereign immunity, "he would have undermined

the allegation in his Complaint that the State 'continues to exercise ultimate authority and control over the governance of UMMS.'" JA080.

The district court also rejected Mr. Hammons's argument that *Lebron* had already resolved the sovereign-immunity question. JA066-067. In *Lebron*, the Supreme Court held that even though Congress's declaration that Amtrak is a private entity did not insulate it from claims under the First Amendment, Congress's "statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit." *Lebron*, 513 U.S. at 392. Mr. Hammons argued that, under *Lebron*, UMMS's statutory disavowal of agency status similarly indicates that UMMS lacks sovereign immunity. JA036-038. Mr. Hammons moved for reconsideration, which the district court denied on October 25, 2021. JA109. In so doing, the district court characterized *Lebron*'s discussion of sovereign immunity as dicta and concluded that UMMS's statutory disavowal of agency status was not sufficiently explicit to constitute a waiver of sovereign immunity. JA096-097.

Discovery proceeded based on Mr. Hammons's statutory claim, and the parties eventually filed cross-motions for summary judgment. On January 6, 2023, the court granted Mr. Hammons's motion for summary judgment on his statutory claim and denied Defendants' cross-motion. JA1029. The court found that the "undisputed facts establish that the cancellation [of Mr. Hammons's surgery] was discrimination on the basis of sex." JA985. As Dr. Cunningham's uncontradicted

testimony on behalf of St. Joseph made clear, that cancelation occurred pursuant to a policy "permit[ting] all patients to obtain doctor-recommended medically necessary hysterectomies, *except* transgender patients seeking treatment for gender dysphoria." JA985. On March 13, 2023, the court accordingly entered judgment for Mr. Hammons, incorporating its previous dismissals of Mr. Hammons's constitutional claims, and awarding Mr. Hammons compensatory damages of $748.46 on his statutory claim, exclusive of prejudgment interest. JA1071-1072.

On April 10, 2023, Mr. Hammons filed his Notice of Appeal to this Court to appeal the earlier dismissal of his constitutional claims. JA1073.[2]

## SUMMARY OF ARGUMENT

The district court erroneously dismissed Mr. Hammons's constitutional claims based on sovereign immunity. Whether the question is evaluated directly under

---

[2] Defendants have filed a Notice of Conditional Cross-Appeal, which challenges the district court's entry of judgment in Mr. Hammons's favor if and only if this Court determines that it has jurisdiction over Mr. Hammons's appeal. JA1076. Defendants have also twice moved this Court to dismiss Mr. Hammons's appeal as moot. ECF Nos. 6, 33. The first motion argued that because Mr. Hammons has received compensatory damages on his statutory claim, he is not entitled to separately pursue nominal damages for his constitutional claims. ECF No. 22. The second motion argued that Defendants have unilaterally mooted the nominal damages claims by mailing Mr. Hammons $2.00 in cash, which Mr. Hammons promptly returned, without any finding of liability or entry of judgment in Mr. Hammons's favor. ECF No. 33-1. As set forth in Mr. Hammons's opposition papers, both motions should be denied. ECF Nos. 21, 37, 48.

*Lebron,* or the "arm of the state" test articulated in *Ram Ditta*, UMMS is not an arm of the state and has not been vested with the State of Maryland's sovereign immunity.

In *Lebron*, the Supreme Court addressed the governmental status of nominally private corporations like UMMS and squarely held that such entities are part of the government for purposes of the First Amendment but do *not* have the governmental privileges of sovereign immunity. *See* 513 U.S. at 392. This aspect of *Lebron* was not dicta. It was an essential part of the Court's holding because it allowed the Court to reconcile the outcome in *Lebron* with *Bank of United States v. Planters' Bank of Georgia*, 22 U.S. 904 (1824), which had held that government-created corporations do not have sovereign immunity. Reconciling the two cases, the Court explained that "it does not contradict [*Planters' Bank*] to hold that a corporation is an agency of the Government, for purposes of the constitutional obligations of Government rather than the 'privileges of the government,'" such as sovereign immunity. *Lebron*, 513 U.S. at 399.

Because UMMS's authorizing statute has a virtually identical disavowal of agency status as the statute at issue in *Lebron*, that statutory disavowal is "assuredly dispositive of [its] status as a Government entity for purposes" of "those inherent powers and immunities of Government agencies," such as "sovereign immunity from suit." *Id.* at 392. The district court held that this statutory disavowal did not constitute a clear and unambiguous waiver of sovereign immunity. But that confuses

the question of whether immunity has been "waived" with the antecedent question of whether UMMS was ever vested with sovereign immunity in the first place. Under *Lebron*, the statutory disavowal of UMMS's agency status means that UMMS has no sovereign immunity to be waived.

UMMS also lacks sovereign immunity under *Ram Ditta*'s four-factor test for identifying which governmental entities are "arms of the state." The district court's analysis of the *Ram Ditta* factors was infected by its faulty assumption that *Lebron*'s test for qualifying as a governmental entity was "synonymous" with *Ram Ditta*'s test for qualifying as an "arm of the state." To the contrary, in the context of government-created corporations, the two tests frequently point in different directions.

Here, it is undisputed that the most important *Ram Ditta* factor weighs against "arm of the state" status because there is no risk that a judgment against UMMS would be paid, either directly or indirectly, by the State treasury.

The second *Ram Ditta* factor also weighs against "arm of the state" status because UMMS has operational autonomy, with only minor restrictions that are similar to those imposed on municipalities or private entities that do business with the government. While the fact that the Governor appoints UMMS's board of directors makes UMMS part of the government for purposes of the First Amendment under *Lebron*, this Court and other circuits have repeatedly held that the appointment power is not sufficient by itself to make a governmental entity an "arm of the state."

*See Oberg III*, 804 F.3d at 654, 668-69; *Hennessey*, 53 F.4th at 537; *Takle*, 402 F.3d at 770-71; *Fresenius*, 322 F.3d at 71.

The third *Ram Ditta* factor is neutral because UMMS is responsible for specifically serving the Baltimore area in addition to its statewide activities.

And the final *Ram Ditta* factor weighs against "arm of the state" status because UMMS's authorization statute specifically declares that the corporation is not "a State agency . . . and is not subject to any provisions of law affecting only governmental or public entities." Md. Code Ann., Educ. § 13-303(a)(2). Contrary to the district court's erroneous assumption, the fact that UMMS is an "instrumentality of the State" under the Maryland Public Information Act ("MPIA"), JA079, says nothing about whether UMMS is an "alter ego" of Maryland or "arm of the state." Open-records laws like the MPIA are "minor strings" that "have little practical effect on [an entity's] independence" and "do little work in distinguishing arms of the state from independent political subdivisions." *Oberg III*, 804 F.3d at 672. And "[i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." *Fresenius*, 322 F.3d at 63.

Because UMMS lacks sovereign immunity under *Lebron* and is not an "arm of the state" under *Ram Ditta*, the district court's dismissal based on sovereign

immunity should be vacated and the case should be remanded for further consideration of Mr. Hammons's constitutional claims.

## STANDARD OF REVIEW

"Whether a state-created entity is an arm of its creating state and therefore entitled to assert the state's sovereign immunity is a question of law reviewed de novo." *Pele v. Pa. Higher Educ. Assistance Agency*, 628 F. App'x 870, 872 (4th Cir. 2015); *see also Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). "When reviewing a complaint dismissed for failure to allege facts supporting subject matter jurisdiction, [courts] afford the plaintiff the same procedural protection as [he] would receive under a Rule 12(b)(6) consideration, wherein the facts alleged in the complaint are taken as true, and the defendant's challenge must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 361 (4th Cir. 2020) (cleaned up).

## ARGUMENT

## I. UNDER *LEBRON*, UMMS IS A STATE GOVERNMENTAL ENTITY THAT LACKS SOVEREIGN IMMUNITY.

"[U]sually, private corporations are not the government." *White Coat Waste Project*, 35 F.4th at 190. But "a special class of corporate entities, 'Government-created and -controlled corporations,' . . . are part of the government despite their ostensibly private character." *Id.* (quoting *Lebron*, 513 U.S. at 397).

In *Lebron* the Supreme Court addressed the governmental status of such organizations in the context of a suit against Amtrak and issued a set of twin holdings. First, the Court established a simple bright-line test for determining whether such corporations are part of the government for purposes of the Constitution's protections for individual rights. *See Lebron*, 513 U.S. at 399. Second, the Court held that when the government-created corporation contains a statutory disavowal of agency status, that corporation does not share in the government's sovereign immunity. *Id.* at 392. Those twin holdings control this case. The statute creating UMMS easily satisfies *Lebron*'s three-part test, and it contains an unambiguous statutory disavowal of UMMS's status as a state agency.

A.      **Under *Lebron*, UMMS is Bound by the First Amendment Despite its Statutory Disavowal of Governmental Status.**

Under a three-part test established by the Supreme Court in *Lebron*, a nominally private corporation is "part of the government for purposes of the First Amendment where: (1) creation of the corporation occurred by 'special law'; (2) creation was 'for the furtherance of governmental objectives'; and (3) retention by the government of "permanent authority to appoint a majority of the directors of that corporation.'" *White Coat Waste Project*, 35 F.4th at 191 (quoting *Lebron*, 513 U.S. at 397, 400).

The *Lebron* test ensures that no "government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the

corporate form." *Lebron*, 513 U.S. at 397. "The government is afforded administrative flexibility to achieve its ends, but organizational creativity cannot release it from its constitutional mandates." *White Coat Waste Project*, 35 F.4th at 190.

As the district court properly recognized, UMMS satisfies all three elements of *Lebron*'s test. JA070-072. UMMS was created "by special law." JA070; Md. Code Ann., Educ. §§ 13-301-13-313. UMMS was created "for the furtherance of governmental objectives." JA070; Md. Code Ann., Educ. § 13-302. And Maryland retains "permanent authority to appoint a majority of the directors of" UMMS. JA071; Md. Code Ann., Educ. § 13-304(b).

## B. Under *Lebron*, UMMS Lacks Sovereign Immunity Because of its Statutory Disavowal of Governmental Status.

As explained above, *Lebron* established that some nominally private government-created corporations are governmental entities for purposes of complying with the First Amendment even when the legislature disavows the corporation's governmental status. But *Lebron* did not declare that such a corporation should be deemed part of the government for all purposes. To the contrary, *Lebron* specifically held that Congress's "statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit." 513 U.S. at 392; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2390 (2023) (Kagan, J., dissenting) ("Our holding [in *Lebron* that Amtrak was governmental entity], we said, did not

mean Amtrak had sovereign immunity."); *Miller v. Ill. Cent. R.R. Co.*, 474 F.3d 951, 957 (7th Cir. 2007) (explaining that, under *Lebron*, "the fact that Amtrak's organic statute says that Amtrak 'is not a department, agency, or instrumentality of the United States Government,' . . . is a disclaimer of sovereign immunity . . . and such a disclaimer might seem to expose Amtrak to all the normal hazards of litigation" (citation omitted)).

UMMS's organic statute contains a functionally identical disavowal of UMMS's governmental status. It states that UMMS "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities." Md. Code Ann., Educ. § 13-303; *compare Lebron*, 513 U.S. at 391 (quoting 45 U.S.C. § 541 (declaring that Amtrak "will not be an agency or establishment of the United States Government")). Under *Lebron*'s simple test, that disavowal of UMMS's agency status is "assuredly dispositive of [UMMS's] status as a Government entity for purposes of matters that are within [Maryland's] control," including, "for example," its sovereign immunity. *Lebron*, 513 U.S. at 392.

Although the district court characterized this portion of *Lebron* as dicta, the Supreme Court's discussion of sovereign immunity was an indispensable part of the Court's holding. Before it decided *Lebron*, the Supreme Court had previously held in *Bank of United States v. Planters' Bank of Georgia*, 22 U.S. 904 (1824), that a

private banking corporation created by Georgia did not share Georgia's sovereign immunity under the Eleventh Amendment even though Georgia owned the bank's stock. In a decision by Chief Justice Marshall, the Supreme Court had explained that "[t]he government, by becoming a corporator, lays down its sovereignty so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter." *Id.* at 908; *see also* Brief of Respondents, *Lebron*, 1994 WL 488299, at *27 (Sept. 8, 1994) (citing *Planters' Bank,* 22 U.S. at 907). Thus, to reach its conclusion that Amtrak was part of the government for purposes of the First Amendment, the Supreme Court had to distinguish *Planters' Bank*'s holding that private, state-created corporations are not protected by the Eleventh Amendment.

The Court distinguished *Planters' Bank* by drawing a sharp line between disavowing the *benefits* of being a governmental entity and disavowing the *obligations* of being a governmental entity. According to the Court, "it does not contradict [*Planters' Bank*] to hold that a corporation is an agency of the Government, for purposes of the constitutional obligations of Government rather than the 'privileges of the government.'" *Lebron*, 513 U.S. at 399. Thus, consistent with *Planters' Bank*, Congress's statutory "disclaimer of [Amtrak's] agency status" was "assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control," including "those inherent powers and

immunities of Government agencies that it is within the power of Congress to eliminate," such as "sovereign immunity from suit." *Id.* at 392. "But it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Id.* The Court's discussion of Amtrak's sovereign immunity was, thus, a critical element of the Court's holding.

A proper reading of *Lebron* commands the conclusion here that UMMS does not share Maryland's sovereign immunity because UMMS's authorizing statute expressly states it is not a state agency or otherwise part of the Maryland government.

**C.    Instead of Analyzing Whether UMMS Was Invested with Sovereign Immunity, the District Court Erroneously Analyzed Whether Sovereign Immunity Was "Waived."**

Despite all this, the district court concluded that Maryland's statutory disavowal of UMMS's governmental status did not constitute a sufficiently clear and unambiguous waiver of sovereign immunity. JA097. But asking whether Maryland "waived" UMMS's sovereign immunity is the wrong question. The relevant question here is whether Maryland ever vested UMMS with sovereign immunity in the first place. The "first-stage question [is] whether immunity exists." *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1031 (9th Cir. 2023) (en banc). "Waiver and

abrogation are second-stage inquiries as to whether, if an entity is immune, that immunity may be overcome." *Id.*

The district court overlooked that critical distinction, concluding that "[r]egardless of the label, whether waiving, depriving, or stripping sovereign immunity, the action by the legislature must be explicit or express." JA097. But that is incorrect. A plaintiff bears the burden of establishing that sovereign immunity has been waived, but the burden of establishing that an entity was imbued with sovereign immunity rests with the entity asserting sovereign immunity. *See Hutto*, 773 F.3d 536, 543 (4th Cir. 2014). "It would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." *Fresenius*, 322 F.3d at 63. Thus, far from requiring an "explicit or express" waiver, this Court and others have routinely found that hybrid entities such as UMMS lack sovereign immunity even when the authorizing statute is completely silent on the issue. *See Oberg III*, 804 F.3d at 654-57; *Hennessey*, 53 F.4th at 523, 533-42; *Takle*, 402 F.3d at 770-71; *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 291-97 (2d Cir. 1996); *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140 (3d Cir. 1995).

In any event, even if a clear and unequivocal "waiver" were required in this context, the district court never explained why the statutory language for Amtrak in

*Lebron* was sufficient to constitute such a waiver while the statutory language for UMMS in this case is not. The district court's treatment of UMMS and the Supreme Court's treatment of Amtrak are irreconcilable.

## II. UMMS IS NOT AN "ARM OF THE STATE" WITH SOVEREIGN IMMUNITY UNDER *RAM DITTA*.

As discussed above, *Lebron* establishes that UMMS lacks sovereign immunity. But even if *Lebron* does not already resolve the issue, UMMS would also lack sovereign immunity under this Court's four-factor test for identifying which governmental entities qualify as arms of the state. *See Ram Ditta*, 822 F.2d at 457-58 (articulating the four-factor test). To determine whether an entity is an arm of the state vested with sovereign immunity this Court looks to four factors: (i) "whether the state treasury will be responsible for paying any judgment that might be awarded" (the "most important consideration"); (ii) "whether the entity exercises a significant degree of autonomy from the state"; (iii) "whether it is involved with local versus statewide concerns"; and (iv) "how it is treated as a matter of state law." *Id.*

"The purpose of the arm-of-state inquiry is to distinguish arms or alter egos of the state from 'mere political subdivisions of [the] State such as counties or municipalities,' which, though created by the state, operate independently and do not share the state's immunity." *Oberg III*, 804 F.3d at 651 (quoting *Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002)). Thus, if "the State treasury will not be liable for

a judgment, sovereign immunity applies only where the governmental entity is so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Hutto*, 773 F.3d at 543 (cleaned up).

Here, UMMS is plainly not an "arm of the state" under the *Ram Ditta* factors. The first and most important factor weighs strongly against a finding of sovereign immunity because Maryland will not be liable for any judgment, either directly or as a practical matter, and none of the other *Ram Ditta* factors weighs in favor of sovereign immunity. Indeed, on strikingly similar facts, the Seventh and Tenth Circuits have both concluded that when state university health care systems were partially privatized, with their assets and operations transferred into new state-created private corporations, those new entities were not arms of the state and were not entitled to share the states' sovereign immunity. *Hennessey*, 53 F.4th at 523, 533-42; *Takle*, 402 F.3d at 770-71.

In reaching the contrary conclusion, the district court misapplied the *Ram Ditta* factors based on its erroneous assumption that "*Lebron*['s test] to determine whether UMMS is part and parcel of government for purposes of state action" and the "test to determine whether UMMS is an arm of the state for purposes of sovereign immunity" are "really synonymous." JA076. Contrary to the district court's

assumption, it is well-established that "not all non-local, governmental entities are 'arms' of the sovereign," and that an entity's designation as a "government instrumentality" is not "dispositive on arm-of-the-state questions." *Grajales v. P.R. Ports Auth.*, 831 F.3d 11, 22 (1st Cir. 2016). The proper inquiry is not whether a state-created corporation is a state instrumentality, but the more specific question of "whether [that instrumentality] may invoke the State's immunity." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see Oberg III*, 804 F.3d at 654, 677 (concluding that state-created corporation was not an arm of the state even though the statute designated the entity as a "government instrumentality").

As discussed below, the district court's conflation of those two distinct concepts led the court to make critical errors when analyzing the *Ram Ditta* factors. Far from being synonymous, the *Ram Ditta* test and the *Lebron* test frequently point in opposite directions. Neither the district court nor Defendants could identify any case in which an entity with a similarly modest set of restrictions on its autonomy was found to be an arm of the state—much less a case in which such a finding was made despite the lack of any financial exposure to the state and despite an express statutory disavowal of the entity's governmental status.

**A.** **The First *Ram Ditta* Factor Weighs Against Sovereign Immunity Because the State Treasury Will Not Pay Any Judgment Against Defendants.**

This Court has "repeatedly emphasized" that the "most important consideration" related to Eleventh Amendment immunity is the first *Ram Ditta* factor: "whether the state treasury will be responsible for paying any judgment that might be awarded." *Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1048 (4th Cir. 2024) (quoting *Ram Ditta*, 822 F.2d at 457). Indeed, the first factor "dominates the inquiry." *Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1052 (4th Cir. 1995). In addressing whether the state treasury will be responsible, "courts must consider *the practical effect* of a putative judgment on the state treasury" and ask whether "the state is functionally liable, even if not legally liable." *Singleton*, 103 F.4th at 1049 (cleaned up). For example, an entity would not qualify as financially independent if its "continued existence and ability to fulfill its State-mandated mission depends on the State continually refilling [its] coffers through annual appropriations." *Id.*

Here, the district court properly found—and Defendants conceded below—that an award of damages would not be paid from the State treasury. JA077. Under UMMS's authorizing statute, UMMS's obligations "[a]re payable only from assets of the Medical System Corporation" and "[a]re not debts or obligations of the University or the State." Md. Code Ann., Educ. § 13-310.

Nor would the Maryland treasury be "functionally liable" as a practical matter because other provisions of UMMS's authorizing statute insulate the State budget from UMMS's liabilities. UMMS is not subject to Maryland's annual budgeting process. To the contrary, UMMS was incorporated specifically because it was "fiscally desirable for the State of Maryland to separate the operations, revenues, and obligations of [UMMS] from the State." *Id.* § 13-302(6). Thus, UMMS must be a "self-supporting entity" to the "maximum extent practicable," *id.*; UMMS must indemnify the State in certain circumstances, thereby protecting the public coffer at the expense of UMMS's own budget, *see id.* § 13-308(c); and UMMS rather than the State must reimburse the legal costs of certain personnel, *id.* § 13-308(d)-(e). In these circumstances, where an entity is "structured . . . to be self-sustaining," government instrumentalities rarely have sovereign immunity because no risk is posed to the state treasury. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 49-51 (1994); *see Oberg III*, 804 F.3d at 677 (finding that first factor weighed against sovereign immunity because the entity was "entirely self-sufficient"); *compare Singleton*, 103 F.4th at 1050 (finding that first factor weighed in favor of sovereign immunity because the state was "practically responsible for the entity's solvency").

The first and most important *Ram Ditta* factor therefore weighs heavily against UMMS's sovereign immunity.

**B.    The Second *Ram Ditta* Factor Weighs Against Sovereign Immunity Because UMMS Has Operational Autonomy from the State.**

Defendants' extensive operational autonomy also weighs against arm-of-the-state status.   Under this Court's precedents, the factors that are relevant to determining whether an entity has operational autonomy under *Ram Ditta* include: who appoints the entity's directors or officers; who funds the entity; whether the state can veto the entity's actions; whether the entity can contract, sue and be sued, and purchase and sell property; and whether the state attorney general represents the entity in legal matters.  *See Oberg III*, 804 F.3d at 668; *see also United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 137 (4th Cir. 2014) ("*Oberg II*").

These indicia of operational autonomy overwhelmingly point to UMMS's independence.  The district court reached a contrary conclusion only by placing inordinate and unjustified weight on the fact that the Governor appoints UMMS's board of directors.  But, as detailed below, while the power to appoint board members is sufficient to establish that an entity is part of the government under *Lebron*, it is usually insufficient to establish that a governmental entity is entitled to sovereign immunity as an arm of the state.  *See, e.g.*, *Oberg III*, 804 F.3d at 668-71 (concluding that autonomy factor weighed against "arm of the state" status even though the government appointed the board of directors); *Hennessey*, 53 F.4th at

537-38 (same); *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 422-23 (7th Cir. 2008) (same); *Takle*, 402 F.3d at 770-71 (same); *Fresenius*, 322 F.3d at 71–72 (same); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1427 (9th Cir. 1991) (same).

When examined as a whole, the relevant indicia of operational autonomy overwhelmingly underscore Defendants' separation from the State for purposes of the Eleventh Amendment.

### 1.    *UMMS is financially independent.*

*First* and "[m]ost critically, [UMMS] is financially independent." *Oberg II*, 745 F.3d at 139.  As Defendants submitted below, UMMS's "internal affairs and funding are entirely independent of Maryland" and UMMS "has separate 'operations, revenues, and obligations' and does not depend on state funding or other intervention."  Memorandum in Support of Defendants' Motion to Dismiss, *Jesse Hammons v. Univ. of Md. Med. Sys. Corp., et al.*, No. 20-cv-02088, ECF No. 39-1 at 5.  *Compare Singleton*, 103 F.4th at 1051 (finding lack of operational autonomy where "[t]hrough the power of the purse, the State plays an active role in determining [entity's] direction and priorities for the coming year" and "makes judgments during the budgetary process about the level of funding that should be allocated to each of the various funds that [the entity] administers").[3]

---

[3] The authorizing statute requires UMMS to submit its annual budget to "the Governor, the Joint Audit and Evaluation Committee, and the Board of Regents" for

## 2. The State cannot veto UMMS's actions, and UMMS can enter into contracts, buy and sell assets, and sue and be sued.

*Second*, UMMS has operational control over its activities, and the State cannot veto UMMS's actions. UMMS possesses all the regular corporate powers associated with operational autonomy, including the ability to enter into contracts, sue or be sued, and buy and sell assets. Md. Code Ann., Educ. § 13-303(b) (providing UMMS has "all powers of a Maryland corporation" except for those "expressly limited" by its organic statute); Md. Code Ann., Corps. & Ass'ns § 2-103 (enumerating these corporate powers).

The few minor constraints on UMMS do not constitute significant limitations on UMMS's autonomy under prevailing precedent. Critically, "[t]he arm-of-state inquiry . . . does not turn on whether the entity is subject to *any amount* of state regulation at all, or whether it is subject to more regulation than a private business,

---

auditing. Md. Code Ann., Educ. § 13-303(g). But such requirements do not constitute an interference with operational autonomy unless the legislature actually has power to alter the entity's funding. *See Hennessey*, 53 F.4th at 535; *United States v. Fla. Birth-Related Neurological Injury Compensation Ass'n*, No. 20-13448, 2022 WL 1180142, at *4-5 (11th Cir. Apr. 21, 2022) (per curiam). Moreover, because Maryland imposes similar auditing requirements on municipalities, *see* Md. Code Ann., Local Gov't. §§ 16-305(a), 16-306, the requirement that UMMS submit its budget for inspection does not distinguish UMMS from other governmental entities that are not arms of the state. *See Oberg III*, 804 F.3d at 672 (concluding that similar requirements "have little practical effect on [the entity's] independence and are not dissimilar from requirements imposed by the state on other political subdivisions").

but whether the entity functions independently of the state despite the state regulation to which it is subject." *Oberg III*, 804 F.3d at 672-73 (emphasis added).

Here, none of the minor restrictions identified by the district court comes close to establishing lack of autonomy for purposes of *Ram Ditta*. To the contrary, similar restrictions apply to many local governmental entities and private corporations that do business with the State. One of the only exceptions to UMMS's autonomy is that, although UMMS is free to buy and sell new properties—including its acquisition of St. Joseph in this case—UMMS cannot sell the real property that was originally owned by the State and transferred to UMMS as part of the initial Asset Purchase Agreement. *See* Md. Code Ann., Educ. § 13-303(b).[4]

But the fact that Maryland has effectively allowed UMMS to permanently lease State buildings instead of transferring ownership outright does not

---

[4] These properties account for only a fraction of UMMS's current real estate and assets. The original properties transferred to UMMS were "those health care delivery components of the University that are in Baltimore City . . . including University Hospital, the University Cancer Center, and the clinical component of the Institute [for Emergency Medical Services Systems]." *Id.* § 13-301(k). By contrast, UMMS currently owns eleven hospitals, including facilities in the Washington Metro Area (acquired in 2000), Charles County (acquired in 2011), Upper Chesapeake (acquired in 2011), and the Eastern Shore (acquired in 2006 and 2013), and additional hospitals in the Baltimore area, including St. Joseph (acquired in 2012), the University of Maryland Rehabilitation and Orthopedic Institute (affiliated in 1985), the University of Maryland Medical Center Midtown Campus (acquired in 2013), Mt. Washington Pediatric Hospital (acquired in 2000). *See* Md. Manual On-Line: University of Maryland Medical System Corporation, https://msa.maryland.gov/msa/mdmanual/25ind/priv/html/medf.html (last visited Oct. 31, 2024).

meaningfully distinguish UMMS from any other private entity. "Many private entities operate on public land or in public buildings; consider concessionaires in airports." *Takle*, 402 F.3d at 771. Operating on public property with the permission of the government does not imbue a corporation with sovereign immunity.

The district court stated that the Regents of the University System continue to exercise control over UMMS because they retain ultimate power to dissolve the corporation. JA103-104. But, as this Court has previously explained, the power to dissolve a state-created entity does not signify that the entity is an arm of the state. "[T]he State may destroy or reshape *any* unit it creates," including local governmental entities, "yet cities and counties do not enjoy Eleventh Amendment immunity." *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 226 (4th Cir. 2001) (emphasis added) (quoting *Hess*, 513 U.S. at 47); *see Oberg III*, 804 F.3d at 672 (observing that the entity may be dissolved by Commonwealth but still finding it was not an arm of the state).

The district court also stated that "the University System retains control over UMMS . . . through the requirement that the Regents of the University System approve UMMS's annual contract." JA102-103. But that "annual contract" is the contract for services that UMMS provides to the University System—not UMMS's contracts with third parties. *See* Md. Code Ann., Educ. § 13-301(b). The fact that the University System must "approve" the contract is unremarkable because a

bilateral contract always requires the agreement of both parties. *Cf. Hennessey,* 53 F.4th 535 n.7 ("It is not apparent how these revenue streams differentiate [the privatized entity] from a private hospital that contracts with the state and provides like services."). Again, this fact does not meaningfully distinguish UMMS from any private corporation.

The district court also erred in characterizing the University of Maryland as having the ability to veto UMMS's applications for federal and private grants. JA102. The statute requires UMMS to seek permission to apply for any *State* grants, but not federal and private ones. Md. Code Ann., Educ. § 13-303(i). For those grants from third parties, the statute simply requires UMMS to "coordinate with University fund-raising efforts." *Id.* § 13-303(j). An instruction for two entities to work together is not comparable to letting one entity call all the shots.

These modest restrictions on UMMS are miles apart from the restrictions constraining the operational autonomy of the University of Maryland in *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 264 (4th Cir. 2005). *See* JA101-104 (relying extensively on *Maryland Stadium*). Through its annual appropriation process, the Maryland legislature "retains oversight ability over every aspect of the University[.]" *Maryland Stadium*, 407 F.3d at 264. The University cannot "purchase and sell real property and enter into contracts over $500,000" without prior State approval. *Id.* In addition, "the University's income is handled

as directed by the State Treasurer and all University property is deemed property of the State." *Id.* None of these restrictions is comparable to the limited constraints placed on UMMS.

### 3. The Attorney General of Maryland does not represent UMMS.

The Maryland Attorney General does not represent UMMS, and Defendants have been represented by private counsel throughout this litigation. *See* JA 001-005; *Compare id.* at 264-65 (finding lack of operational autonomy where attorney general represents entity); *Singleton*, 103 F.4th at 1051 (same), *with Ram Ditta*, 822 F.2d at 458-59 (finding operational autonomy without attorney general representation), *and Cash*, 242 F.3d at 225 (same).

### 4. The government's appointment powers are not accompanied by other mechanisms of control.

Against the weight of all these considerations, the district court relied disproportionately on the fact that the Maryland government appoints UMMS's board of directors, conflating the significance of this factor to the *Lebron* test with its importance to the *Ram Ditta* analysis. To be sure, both *Lebron* and *Ram Ditta* consider the government's authority to appoint members of an organization's board, but the two tests are hardly "synonymous." Appointment power is far less important to the *Ram Ditta* analysis than to the *Lebron* test.

For purposes of *Lebron*, the *only* thing required "is that the government control the corporation by appointing a majority of its board[.]" *White Coat Waste*

*Project*, 35 F.4th at 195.  When the government has this appointment power, the *Lebron* test is met; whether government officials *actually* exercise control over the corporation's operations as a practical matter is simply not relevant.  *See id.*  By contrast, merely having the power to appoint the board is insufficient on its own to establish that an entity lacks operational independence for purposes of sovereign immunity.  *See Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (concluding that Missouri Board of Police Commissioners was not arm of the state notwithstanding that four out of five board members were appointed by Missouri's governor); *Oberg II*, 745 F.3d at 139 (finding that corporation has operational autonomy even though its board is "composed of gubernatorial appointees and state legislators or officials").

Rather—as other circuits have consistently held—for purposes of determining whether an entity is an "arm of the state," the power to appoint must usually be accompanied by the exercise of actual operational control through the power of removal or other means.  *Hennessey*, 53 F.4th at 537 (explaining that appointment "is but one consideration and a governor's appointment power is not sufficient to establish that the autonomy factor favors an arm-of-the-state finding," and "courts also look at (1) the ability of the governor to remove appointees, and (2) the governor's power to block or veto action taken by the board of the entity" (citation omitted)); *Fresenius*, 322 F.3d at 71–72 ("The governor's appointment power over the board is not enough in itself to establish that PRCCCC is an arm of the state. . .

. The statute itself does not give the governor power to remove Board members, and it is unclear where such power resides. Nor does the statute give the Commonwealth veto power over the decisions of the Board, a key element of control." (citation omitted)); *Takle*, 402 F.3d at 770 ("[T]he power to appoint is not the power to control.").

Here, UMMS's authorizing statute allows the government to *appoint* directors, but the Governor's power to *remove* directors is limited to instances in which they have filed false statements of financial interest or improperly benefitted from sole source procurement. *See* Md. Code Ann., Educ. § 13-304(l)(2), (m)(2). These "for cause" removal protections strongly indicate operational autonomy for purposes of sovereign immunity. *See Maliandi v. Montclair State Univ.*, 845 F.3d 77, 98-99 (3d Cir. 2016) (for-cause removal protection gave directors "considerable decisional independence once appointed"); *Fla. Birth-Related Neurological Injury Compensation Ass'n*, 2022 WL 1180142, at *4 (explaining that for cause removal protection is a "significant limitation" on the governor).

Thus, while the Governor's power to appoint UMMS's board of directors is one factor weighing against UMMS's operational autonomy, the appointment power does not by itself tip the second *Ram Ditta* factor in Defendants' favor.

## C. The Third *Ram Ditta* Factor Is Neutral Because UMMS Is Required to Serve Both Local and Statewide Concerns.

The third *Ram Ditta* factor is neutral because Defendants are obliged to address local and not merely statewide interests. UMMS's authorizing statute expressly directs UUMS provide medical care to the neighborhoods of Baltimore. The statute defines the "medical system" as consisting of particular "health care delivery components of the University *that are in Baltimore City.*" Md. Code Ann., Educ. § 13-301(k) (emphasis added). Section 13-302 sets out the "purposes of the medical system," which include "rendering comprehensive health care to the community naturally served by University Hospital to assure its availability to citizens of that community[.]" *Id.* § 13-302(3). The "community naturally served" is defined as, *inter alia*, "the hospital's historic service population and those neighborhoods traditionally served by the hospital," which are all in the Baltimore area. *Id.* § 13-301(f). Similarly, the "President" who sits *ex officio* on UMMS's board, *see id.* § 13-304(c)(9), is not the President of the University of Maryland at large, but the President of the *Baltimore* campus, *id.* § 13-301(r).

This local focus, mandated by the statute, is not displaced by UMMS's statewide concerns. That UMMS also provides medical care to citizens "of the State and region," *id.* § 13-302(1), and has "purposes extend[ing] to all citizens of the State," *id.* § 13-302(2), does not imply that Defendants' state interests are *primary*. *See Ram Ditta*, 822 F.2d at 459 (entity intended to operate for the "general benefit

of the citizens of the State of Maryland" not arm of the state because residents of two specific counties would primarily benefit); *Oberg III*, 804 F.3d at 675 ("extent" of nonstate concern was "relevant to the state-concern factor").

Accordingly, the district court erred in holding that the statute's references to state concerns tilted the third *Ram Ditta* factor towards arm-of-the-state status. The third factor is, at most, neutral.

### D. The Fourth *Ram Ditta* Factor Weighs Against Sovereign Immunity Because Maryland Recognizes UMMS as a State Instrumentality For Some Purposes, But Not As an Alter Ego.

The final *Ram Ditta* factor—"how the entity is treated under state law," *Oberg II*, 745 F.3d at 138—also weighs against arm-of-the-state status. An entity's treatment is ascertained from a variety of state law sources, including "relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996).

Here, UMMS's enacting statute—the obvious starting point—disavows UMMS's status as an arm of the state. The statute declares that UMMS shall be organized as a "private . . . corporation," and "not [as] a State agency, political subdivision, public body, public corporation, or municipal corporation" and "not subject to any provisions of law affecting only governmental or public entities." Md. Code Ann., Educ. § 13-303(a)(2), (m). This express disclaimer is entitled to great

weight. *See Takle*, 402 F.3d at 770 ("It would be nice if the hospital's organic statute stated outright that the hospital is a private entity rather than an arm of the state— that would resolve the issue[.]"); *Grajales*, 831 F.3d at 22, 29 ("[B]y describing the entity not only as an instrumentality of government but also as one that exists 'separate and apart' from the 'Government,' the Act sends [a] strong . . . signal that [the entity] is not an arm [of the state] . . . .").

UMMS's enacting statute also expressly reserves sovereign immunity for "the State" and "the University," but not UMMS. Md. Code Ann., Educ. § 13-308(f). The conspicuous omission of any reference to sovereign immunity for UMMS— within a statute devoted to setting out UMMS's legal duties—strongly indicates that the legislature did not clothe UMMS in sovereign immunity. *See In re Wood*, 993 F.3d 245, 252 (4th Cir. 2021) (explaining that under "a straightforward application of the *expressio unius* canon," a statute's "narrow, specifically articulated exception" implies that other exceptions are not permitted).

Instead of adhering to the plain text of the statute, the district court gave dispositive weight to the fact that the Maryland Court of Appeals held in *Napata v. University of Maryland Medical System*, 12 A.3d 144, 151 (Md. 2011), that UMMS is "a unit or instrumentality of the State government" under the Maryland Public Information Act. JA079-080. That was error. Whether an entity is covered by the MPIA—which applies to all governmental units and instrumentalities, including

state and local entities that indisputably lack sovereign immunity—says nothing about whether the entity qualifies as an alter ego of the state entitled to share in its sovereign immunity. As this Court explained in *Oberg III*, obligations such as being subject to state open-records laws, like the MPIA, are "minor strings" that "have little practical effect on [an entity's] independence" and "do little work in distinguishing arms of the state from independent political subdivisions." 804 F.3d at 672; *accord Takle*, 402 F.3d at 771 (subjection of university hospital's board to state's open-meeting laws did not make it an arm of the state).

Critically, the Maryland Court of Appeals has repeatedly emphasized that Maryland law does not categorically characterize entities as state instrumentalities for every purpose. *See, e.g.*, *Wash. Suburban Sanitary Comm'n v. Phillips*, 994 A.2d 411, 426 (Md. 2010) (explaining that an entity can "def[y] simple and definitive categorization as either a 'State' or 'local' agency or instrumentality for any and all purposes"); *Bennett v. Harford Cnty.*, 301 A.3d 117, 129 (Md. 2023) (explaining that an entity can have "'blend of State, local, and independent characteristics,' that, depending on context, could result in a determination that they are of a State, local or independent character for a particular purpose" (citation and quotation omitted)). The mere fact that UMMS is an instrumentality for purposes of the MPIA does not mean that Maryland law also considers UMMS to be the State's alter ego.

The district court also ignored the second half of *Napata*, which held that even though UMMS was "a unit or instrumentality of the State government" under the MPIA, the MPIA *does not* apply to UMMS because UMMS's authorizing statute declares that that UMMS "shall not be a State agency, political subdivision, public body, public corporation or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities." *Napata*, 12 A.3d at 151-52 (quoting Md. Code Ann., Educ. § 13-303(a)(2)). To the extent that *Napata* is relevant here, that decision confirms that this Court should give full effect to the statute's disavowal of UMMS's governmental status.

*     *     *

The district court's contrary decision failed to give sufficient respect to Maryland's interest in separating itself from UMMS for purposes of sovereign immunity. As the First Circuit has explained, "where an entity claims to share a state's sovereignty and the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution." *Fresenius*, 322 F.3d at 63. "Some entities may be meant to be commercial enterprises, viable and competitive in the marketplace in which they operate. Such enterprises may need incentives to encourage others to contract with them, such as the incentives of application of usual legal standards between private contracting parties." *Id.* at 64. "It would be every bit as much an affront to the state's dignity and fiscal interests were a federal court

to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." *Id.* at 63; *accord Hennessey*, 53 F.4th at 529 (citing *Fresenius*, 322 F.2d at 65).

*     *     *

Any reasonable application of the *Ram Ditta* factors compels the conclusion that UMMS is not an "arm of the state" entitled to share in Maryland's sovereign immunity. Much like a local government or municipality, UMMS is a government instrumentality *and* subject to the obligations or the First and Fourteenth Amendment, but for purposes of sovereign immunity, it is not the State's "alter ego."

## CONCLUSION

The district court's dismissal of Mr. Hammons's constitutional claims based on sovereign immunity should be vacated, and the case should be remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument pursuant to Local Rule 34(a).

Dated: November 5, 2024

Respectfully submitted,

*/s/ Aron Fischer*

Aron Fischer
Andrew D. Cohen
Joshua M. Goldman
Sean M. Lau
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
jgoldman@pbwt.com
slau@pbwt.com

*/s/ Joshua A. Block*

Joshua A. Block
Leslie Cooper
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

Louis J. Ebert (Fed. Bar No. 02031)

ROSENBERG MARTIN
GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7) because it contains 10,571 words. This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface using 14-point Times New Roman font.

*/s/ Aron Fischer*
Aron Fischer
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com


*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief for Plaintiff-Appellant Jesse Hammons with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on November 5, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Aron Fischer*
Aron Fischer
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com

*Counsel for Plaintiff-Appellant*